L. F. Bevil v. The State.

No. 6900.   Decided February 14, 1923.

**Murder—Accomplice—Corroboration—Insufficiency of the Evidence.**
    Where, upon trial of murder, the State's case rested upon the testimony of an accomplice according to his own confession, and so treated in the charge of the court. which was without corroboration by other evidence tending to connect the defendant with the offense charged, the judgment must be reversed and the cause remanded.

    Appeal from the District Court of Collin.   Tried below before the Honorable F. E. Wilcox.

    Appeal from a conviction of murder; penalty, twenty-five years imprisonment in the penitentiary.

    The opinion states the case.

    *Hughston & Neilson,* and *John Doyle,* for appellant.

    *R. G. Storey,* Assistant Attorney General, for the State.

    LATTIMORE, Judge.—Appellant was convicted in the District Court of Collin County of murder, and his punishment fixed at twenty-five years in the penitentiary.

    This is a companion case to Ritter v. State, 92 Texas Crim. Rep., 247.

    This case must be reversed for the lack of evidence.   It was charged in the indictment that appellant and one Fred Ritter on June 11, 1920, in Collin County, Texas, with malice aforethought killed one Stockwell. The learned trial court instructed the jury in his charge that if from the evidence they believed that Cleveland Martin, with malice aforethought, shot and killed said Stockwell, and that prior thereto appellant had agreed with said Martin and Fred Ritter that Martin should kill Stockwell, and that he was killed by Martin in pursuance of said agreement, and that appellant was present at the time of the killing, they should find him guilty as charged.

    The principal State witness was one George Melton, an accomplice, according to his own confession, and so properly denominated in the charge of the court.   His testimony consisted of a narration of facts and statements on the part of appellant, Ritter and Martin subsequent to the killing in which appellant said "we killed Stockwell," and which other acts, statements and conversations indicated activity on appellant's part in procuring false testimony sufficient to secure acquittal of a charge of murdering Stockwell.   The indictment against appellant was not returned until March 25, 1921, or some six or seven months after the homicide, and, as we understand the record, all the conversations and acts of said parties testified to by Melton, and relied upon as connecting appellant with the homicide, occurred during said interim.   In

order that the correctness of our conclusion herein may be manifest, we resort to the well known method of exclusion; that is, the law of this State (Art. 801, C. C. P.) forbidding a conviction of a citizen for crime upon the uncorroborated testimony of an accomplice, which corroborating evidence must of itself tend to connect the accused with the commission of the offense, we, in determining whether there be sufficient corroborative evidence of the accomplice, will consider such other testimony alone and sift same to see if there be in it facts pointing to the accused as a guilty party.

The killing in this case was at night, and beyond question the shooting was done by Cleve Martin, who shot the deceased through the heart. The shooting began at or near the southeast corner of the public square in McKinney, Texas, and deceased, followed by Martin, ran north along the east side of the courthouse square, then out into the square, and then back around to or near the place where the first shot was fired, where deceased fell and Martin overtook and shot him, there being two or more shots fired at this point, the second shot having been fired while the parties were running out in the square away from the sidewalk. After putting on two witnesses to prove death and the cause thereof, the State placed Jess Rutledge upon the stand. Condensed, this witness swore that he saw Martin shoot the first time, and saw him and Stockwell run north, then out into the square where he heard another shot, then back toward the southeast corner of the square, reaching which Stockwell stumbled and fell and Martin shot two or more times and continued snapping his pistol. That appellant herein came running from the direction of the courthouse (which stood in the middle of the square) and that he got to the parties one or two minutes after the last shot was fired. We quote from the tesimony of Mr. Rutledge as to what he saw appellant do:

"He seemed to be coming pretty fast. He was not standing where I saw him but he was moving rapidly in that direction and I thought he was about four steps off when I saw him, he kept on coming to the man with the pistol and grabbed him by the right arm I think, and that was the arm he had the pistol in. At the time he grabbed him Martin was still firing or snapping with his right hand. He grabbed him with his right arm and stopped him from shooting and said he had to go over to the courthouse and immediately took him over there." Rutledge saw appellant do nothing else.

Guy Rambo was the next State witness. He swore that he was partly up the stairs by the side of the Andrews Grocery store at the southeast corner of the square in McKinney when he heard the first shot. He said this stairway was about fifty-five or sixty feet from the corner and that he ran back downstairs to see what the excitement was; . . . that he went across the street toward McKinny's store; . . . that he saw three persons running along the sidewalk and just stepping from the sidewalk to the pavement; . . . that he did not know them

at the time, but according to the evidence one person was Martin, one Stockwell and the other must have been Lute Bevil; . . . that Stockwell was first, Bevil, second and Martin third; . . . they started running in front of Mitchell's store; . . . that they were running up the square when the second shot was fired; . . . that he did not see them when this shot was fired; . . . that he was running across the street when the second shot was fired; . . . that he saw the three persons running along the pavement after the second shot was fired; . . . that the parties were going southwest when he first saw them; they stepped off the pavement and were running around an automobile; . . . that the corner of the grocery building kept him from seeing them; . . . that the second shot was fired before he got to the corner; . . . he did not see anyone on the sidewalk at all except at the third shot; . . . on a former trial he did not state that he saw Bevil; . . . did not say he saw Bevil till he came up to get the gun after the shooting was over; . . . they were running southwest when I first saw them; . . . that on the other trial he said he saw only one man following Stockwell; . . . he testified before, that there were two men running; . . . he told the court there were two when he knew there were three; . . . he did not call Bevil's name on the other trial as being there because he was not asked the question; . . . he saw all three of them running north when he first got there; . . . that he saw the third man last before he got to the corner; . . . that he saw him first when he came up to get the pistol; . . . Bevil was between Stockwell and Martin; . . . "the only thing I saw Bevil do, I saw him pushing toward Martin, sort of like pushing back or holding against him; he was pushing him, and he was between Martin and Stockwell; . . . I did not tell that on the other trial, it was not asked me." We further quote from the concluding part of the rather remarkable testimony of this witness:

"I have no idea what that pushing was but it seemed like that Mr. Bevil, the third party, was pushing back on Martin and seemed to be in the way of him, that is, Martin seemed to be pushing him out of the way to get by him. Bevil seemed to have his hands up against Mr. Martin this way and was just pushing back on him that way and Martin was pushing against him. He had his hands up this way and then he went out this way. I have no idea how he was pushing against him but it seemed like Bevil was in the way of Martin.

"Q. And it appeared to you that he was trying to keep him back? A. Pushing this way and he run around this way like this running"

An old negro named Holmes for the State testified that some days after the killing appellant borrowed a pistol from him, which pistol he and his son identified on this trial. Deputy Sheriff White swore that about two hours before the shooting of Stockwell he saw Martin, appellant and a man whom he did not know, and two girls at ap-

pellant's home, said parties being out at the barn at a feed trough. Officer Kirby swore that after the shooting he saw appellant, Fred Ritter and Martin in the hallway of the courthouse looking for the sheriff's office.

We have given above the material parts of the State's testimony other than that of Melton, the confessed accomplice. There would seem little need for analysis or argument on our part to make plain the fact that the testimony set out in no way tends to show guilt on the part of appellant of the fact that he had agreed with Martin or with Martin and Ritter that Martin should kill Stockwell. Appellant testified that he came to McKinney on the night in question with Ritter and Martin, and that he and Ritter left Martin and went to the courthouse, and presently as they came back toward the southeast corner of the square, the shooting took place, and that he ran to Martin, took from him the pistol and accompanied Martin to the courthouse where he was surrendered to the sheriff. This is in exact accord with the testimony of Rutledge and officers White and Kirby. Rambo's testimony, if believable, would tend to show appellant doing what he could to push Martin back and apparently to prevent the shooting. In reference to the matter of the borrowing of a pistol from the negro Holmes, appellant testified that some days after the shooting he did borrow said pistol for George Melton and at the latter's request turned it over to him. We see nothing in this circumstance or in any of the testimony given by any of the State witnesses save Melton in anywise tending to connect appellant with any plan or agreement or conspiracy to kill Stockwell. We do not care to reproduce the mass of testimony brought forward on behalf of appellant bearing upon the proposition that Melton's story was wholly untrue. For the purpose of the proper disposition of this case we merely conclude his testimony to be without corroboration. So believing, the judgment of the trial court will be reversed and the cause remanded.

*Reversed and remanded.*